MANATT, PHELPS & PHILLIPS, LLP
EDWARD G. BURG, Bar No. 104258
VIRAL MEHTA, Bar No. 261852
LAUREN J. FRIED, Bar No. 309005
2049 Century Park East, Suite 1700
Los Angeles, CA 90067

Telephone:     (310) 312-4000
Facsimile:     (310) 312-4224
E-Mail:        eburg@manatt.com; vmehta@manatt.com;
               lfried@manatt.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA SAN JOSE DIVISION

| | |
|---|---|
| FFV COYOTE LLC, a Washington limited liability company; EMC7, LLC, a Washington limited liability company; ERIC F. BONETTI; DAVID R. BONETTI; GLEN C. KRAL and SUSAN S. KRAL, as Trustees of the Kral 1994 Trust; BENSON GROUP LLC, a California limited liability company; JEAN BEU, as Trustee of the Jean Beu California Property Trust; LEE LESTER/BAILEY LLC, a California limited liability company; and F.R. LESTER CAPITAL, LLC, a California limited liability company<br><br>       Plaintiffs,<br><br>  vs.<br><br>CITY OF SAN JOSE, a municipal corporation; DOES 1 through 10,<br><br>       Defendants. | Case No.  3:22-cv-00837 |

**COMPLAINT FOR VIOLATION OF FIFTH AMENDMENT,**

**EQUAL PROTECTION, AND DUE PROCESS UNDER**

**42. U.S.C. §1983; DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1.      Plaintiffs are entities of families that have owned 126.5 acres of undeveloped land in the North Coyote Valley area of the City of San Jose for about 60 years.  The land was slated for industrial development in the City's first General Plan, and was designated for Industrial Park use in the City's current General Plan, adopted in 2011.  On January 29, 2020, Plaintiffs contracted to sell the land for over $44 million to a buyer that intended to use the land for an industrial use, as permitted under the City's General Plan.  However, on November 16, 2021, the City approved a City-initiated amendment to its General Plan, changing the land use designation of the land from Industrial Park to Agriculture in order to "preserve" the property and prevent it from being developed.  The City had already contributed nearly $50 million to the purchase of adjacent land for preservation as open space.  But instead of purchasing Plaintiffs' property, the City precluded its development by re-designating the property to Agriculture—thereby seeking to accomplish preservation of the property without paying for it.  Agriculture is not an economically viable use of the land, and Plaintiffs cannot obtain a variance or other exception from the Agricultural land use designation initiated by and imposed by the City.  Following the City's action, Plaintiffs' contract to sell the land was terminated by the buyer, as the buyer's proposed industrial use is no longer allowed.  Plaintiffs seek compensation for a taking of their property under the Fifth Amendment and damages for violation of Plaintiffs' federal constitutional rights to equal protection of the laws and due process.

**JURISDICTION AND VENUE**

2.      This action is brought under the Civil Rights Act, 42 U.S.C. §1983.  This Court has jurisdiction under 28 U.S.C. §1331.  Venue is proper in this District under 28 U.S.C. § 1391(b)(2).  The action arises in Santa Clara County under Local Rule 3-2(c), where a substantial part of the events or omissions giving rise to the claims occurred and where the property is situated, and is therefore filed in the San Jose Division of this

1

1    District.

2

3                    **THE PROPERTY AND THE PARTIES**

4         3.      Plaintiffs' property ("the North Coyote Valley Properties" or "the NCV

5    Properties") consists of 126.5 acres located at the southwest corner of Monterey Highway

6    and Bailey Avenue in the City of San Jose.  An aerial photograph showing the location of

7    the NCV Properties (labelled "Subject Property 126 Acres") and the surrounding area is

8    attached as **Exhibit A** and incorporated herein by reference (as are all other attached

9    exhibits).

10        4.      The NCV Properties include Santa Clara County Assessor's Parcel No.

11   712-01-004 ("the Foster Family Parcel") containing approximately 39.148 acres; Santa

12   Clara County Assessor's Parcel No. 712-01-010 ("the Foster/Benson Families Parcel")

13   containing approximately 44.61 acres; and Santa Clara County Assessor's Parcel Nos.

14   712-01-012 and 712-01-011 (collectively "the Lester Family Parcel") containing

15   approximately 42.748 acres.

16        5.      The NCV Properties are bounded by Bailey Avenue on the north; by the

17   Union Pacific Railroad tracks and Monterey Highway on the east; and by Santa Teresa

18   Boulevard on the west.  The NCV Properties lie entirely *within* the jurisdictional limits

19   of the City of San Jose; the City's southerly boundary is a few hundred feet south of the

20   NCV Properties.  The NCV Properties lie entirely *within* the City's Urban Growth

21   Boundary line, which is the area established by the City to provide clarity as to where

22   urban development is to occur; lands *outside* the Urban Growth Boundary are to be

23   preserved for primarily open space, habitat, parkland, or agriculture.  And the NCV

24   Properties lie entirely *within* the City's Urban Services Boundary, which defines the area

25   where services and facilities provided by the City and other public agencies are

26   available, and where urban development requiring such services are to be located.

27   Attached as **Exhibit B** is an aerial photo prepared by the City (modified to show the

28   location of the NCV Properties) which includes the location of the City's boundaries (the

                                          2

area cross-hatched), the City's Urban Growth Boundary line (the green line), and the City's Urban Services Area (the dotted red line).

6.    Plaintiff FFV COYOTE LLC is a Washington limited liability company owned by members of the Foster Family. FFV COYOTE LLC owns an undivided interest in the Foster Family Parcel and the Foster/Benson Families Parcel.

7.    Plaintiff EMC7, LLC is a Washington limited liability company owned by members of the Foster Family. EMC7, LLC owns an undivided interest in the Foster Family Parcel and the Foster/Benson Families Parcel.

8.    Plaintiff ERIC F. BONETTI is an individual residing in Oregon and is a member of the Foster Family. Eric F. Bonetti owns an undivided interest in the Foster Family Parcel and the Foster/Benson Families Parcel.

9.    Plaintiff DAVID R. BONETTI is an individual residing in California and is a member of the Foster Family. David R. Bonetti owns an undivided interest in the Foster Family Parcel and the Foster/Benson Families Parcel.

10.    Plaintiffs GLENN C. KRAL and SUSAN S. KRAL, as Trustees of the Kral 1994 Trust, are members of the Foster Family. GLENN C. KRAL and SUSAN S. KRAL, as Trustees of the Kral 1994 Trust, own an undivided interest in the Foster Family Parcel and the Foster/Benson Families Parcel.

11.    Plaintiff BENSON GROUP LLC is a California limited liability company owned by members of the Benson Family. BENSON GROUP LLC owns an undivided interest in the Foster/Benson Families Parcel.

12.    Plaintiff JEAN BEU, as Trustee of the Jean Beu California Property Trust, is a member of the Benson Family. JEAN BEU, as Trustee of the Jean Beu California Property Trust, owns an undivided interest in the Foster/Benson Families Parcel.

13.    Plaintiff LEE LESTER/BAILEY LLC is a California limited liability company owned by members of the Lester Family. LEE LESTER/BAILEY LLC owns an undivided interest in the Lester Family Parcel.

14.    Plaintiff F.R. LESTER CAPITAL, LLC is a California limited liability

company owned by members of the Lester Family.  F.R. LESTER CAPITAL, LLC owns an undivided interest in the Lester Family Parcel.

15.     Collectively, Plaintiffs FFV Coyote LLC, EMC7, LLC, Eric F. Bonetti, David R. Bonetti, Glenn C. Kral and Susan S. Kral, as Trustees of the Kral 1994 Trust, Benson Group, LLC, Jean Beu, as Trustee of the Jean Beu California Property Trust, Lee Lester/Bailey LLC, and F.R. Lester Capital, LLC are sometimes referred to in this Complaint as "the Owners" or "the Owners of the NCV Properties."

16.     Defendant CITY OF SAN JOSE ("the City") is a municipal corporation and a charter city located in the County of Santa Clara, State of California.

17.     Plaintiffs do not know the true names and capacities of Defendants sued as DOES 1 through 10, inclusive, and therefore sue them by their fictitious names. Plaintiffs allege that Defendants Does 1 through 10, inclusive, are jointly, severally and/or concurrently liable and responsible for the claims for relief set forth herein, acting on their own or as the agents of the City.  Plaintiffs will amend this Complaint to insert the true names of the fictitiously named Defendants when ascertained.

## FACTUAL BACKGROUND

Legal Framework

18.     Every city in California is required to have a General Plan.  (Gov't Code §65300.)  The General Plan is recognized as a "constitution for future development" and is "located at the top of the hierarchy of local government law regulating land use." *DeVita v. County of Napa*, 9 Cal. 4th 763, 772-773 (1995) (internal quotation marks omitted).  A General Plan is required to have certain "elements" or chapters that focus on different planning matters—including land use, circulation, housing, conservation, open space, noise, and safety.  (Gov't Code §65302.)  The Land Use Element designates the distribution, location, and extent of different types of land uses, like housing, business, industry, and open space.  (Gov't Code §65302(a).)  In light of the General Plan's role as the "constitution" at the top of local land use regulation, a city's other land use

4

regulations and decisions are required to be consistent with its General Plan. For example, a property's zoning must be consistent with the property's land use designation in the General Plan, and a proposed project to subdivide or use a property must likewise be consistent with the property's land use designation in the General Plan.

19.    As a charter city, San Jose's law prevails over state law with respect to certain municipal affairs. Prior to 2018, a charter city's zoning ordinances were not required by law to be consistent with its General Plan. In 2018, however, the Legislature enacted SB 1333, mandating that all charter cities' zoning ordinances be consistent with their adopted General Plans. (Gov't Code §65860(d).) SB 1333 thus requires the City's zoning of parcels to be consistent with the parcel's land use designation in the City's General Plan.

The Coyote Valley

20.    Coyote Valley contains over 7,000 acres in the southern part of the City and unincorporated lands south of the City's limits. It is bounded by Tulare Hill to the north, Highway 101 to the east, the City of Morgan Hill to the south, and the Santa Cruz Mountains to the west. Three major roads run north/south through Coyote Valley—Highway 101 at its eastern edge, Monterey Road and the adjacent Union Pacific Railroad tracks to the west of Highway 101, and Santa Teresa Boulevard through the central part of Coyote Valley. Coyote Creek flows northerly from Anderson Lake on the east side of Coyote Valley, and Fisher Creek flows northerly on lands west of Santa Teresa Boulevard, until it joins Coyote Creek north of the Metcalf Energy Center, described below.

21.    Coyote Valley consists of three separate and distinct planning areas, as shown on **Exhibit C** attached, which was prepared by the City (modified to show the location of the NCV Properties). North Coyote Valley (approximately 1,700 acres) is located entirely within the City and was designated for industrial development as part of the North Coyote Valley Employment Lands Growth Area in the City's current

5

General Plan.

22.    Mid-Coyote Valley (approximately 2,000 acres) is located to the south of North Coyote Valley, with a small narrow strip wrapping the east side of North Coyote Valley. Mid-Coyote Valley was designated as an "Urban Reserve" in the City's current General Plan, an area not to be developed before 2040, the entire time horizon of the City's current General Plan. Only a small part of Mid-Coyote Valley (about 16%) is inside the City limits; the remainder is in City's Sphere of Influence but outside its jurisdictional boundary, in unincorporated Santa Clara County. Mid-Coyote Valley is also located outside of the City's Urban Service Area.

23.    South Coyote Valley (approximately 3,600 acres) is located to the south of Mid-Coyote Valley, with a small narrow strip wrapping the east side of Mid-Coyote Valley. South Coyote Valley was designated in the City's current General Plan as a permanent greenbelt between San Jose and Morgan Hill, not to be developed. Like Mid-Coyote Valley, only a small part of South Coyote Valley (about 20%) has been annexed into the City, and the remainder is in the unincorporated County.

24.    Thus, of the three distinct planning areas that comprise Coyote Valley, only North Coyote Valley was designated for development—specifically industrial development—in the City's current General Plan. The NCV Properties are located entirely within North Coyote Valley, as shown on Exhibit C.

History of the NCV Properties And The Decline of Agriculture

25.    The City adopted its first General Plan in 1961. The NCV Properties were designated for "Light Industrial" use in the General Plan's land use map.

26.    Thomas Foster II and Geraldine Foster, husband and wife, purchased a 50% undivided share in the Foster/Benson Families Parcel in 1963. Thomas Foster II was a prominent radiologist who practiced in San Jose. Dr. and Mrs. Foster subsequently purchased the Foster Family Parcel, immediately south of the Foster/Benson Families Parcel. Dr. and Mrs. Foster had four children, and the Foster Family's ownership shares

6

in the Foster/Benson Families Parcel and the Foster Family Parcel are now held by entities or trusts of each of the four children (or their children).  The Foster Family thus owns a 50% undivided interest in the Foster/Benson Families Parcel, and 100% of the Foster Family Parcel.

27.     Allan Benson and Alice Benson, husband and wife, purchased a 1/3 undivided interest in the Foster/Benson Families Parcel in 1960, and increased their ownership share to a 50% undivided interest in 1963.  Allan Benson was also a prominent physician who practiced with Dr. Foster.  Dr. and Mrs. Benson had four children, each of whom grew up in a house on the Foster/Benson Families Parcel. Today, the Benson Family's ownership share in the Foster/Benson Families Parcel is held by entities or trusts of the four children.  The Benson Family thus owns a 50% undivided interest in the Foster/Benson Families Parcel.

28.     Lee Lester and his brother Ray Lester purchased the Lester Family Parcel in 1969.  Lee Lester had one child and Ray Lester had two children, and ownership of the Lester Family Parcel is now held by entities of those three children.  The Lester Family thus owns 100% of the Lester Family Parcel.

29.     The NCV Properties were each purchased as long-term investments, with the intent that, at the time deemed appropriate by the Owners, the properties would be developed as envisioned by the City's General Plan.  When the Foster, Benson, and Lester Families purchased the NCV Properties, they reasonably believed that the properties could be developed for industrial land uses.  And each of the families have continued to invest in the NCV Properties since the time the properties were purchased, including by payment of property taxes and other expenses, with the expectation that the NCV Properties could be developed for industrial uses at the appropriate time.

30.     When the NCV Properties were purchased, they were in an undeveloped area where agriculture was the predominant use of the land.  Tree crops such as prunes were plentiful, supported by local fruit packing and processing facilities.  While development was always ultimately envisioned and expected, the owners of the NCV

Properties continued to use the land for agricultural purposes as an interim use, including leasing the land to farmers. For example, the Foster/Benson Families Parcel was leased to GN Farms, a family entity run by George Nakao, which grew row crops (primarily bell peppers, with occasional crops of chili peppers and cucumbers) on the property, and on other adjacent properties, in the 1960s and 1970s. When Mr. Nakao became too old to farm the land, it was leased for hay and alfalfa crops but the operator was unsuccessful and stopped leasing the land.

31.    As the years passed, agricultural use of the NCV Properties gradually became less and less economically viable due to a variety of factors. Orchard trees died off and were removed; and processing, packaging, and distribution facilities that once supported farming left the area. Tenants that farmed the properties went out of business. Crops that were once planted (like peppers or tomatoes) were discontinued due to low yields or lack of processors, and commercial tree fruit production in the County was essentially eliminated. Costs of farming, including labor, utilities, fuel, and irrigation materials, grew substantially, while the reliability of water supply for crop irrigation diminished. In addition, the City's minimum wage ordinance mandated higher labor costs and made farming outside of the City limits (in Mid-Coyote Valley and South Coyote Valley) more economically attractive to prospective farmers than farming inside the City limits (in North Coyote Valley). Meanwhile, competition from lower-cost Central Valley farming operations created further barriers to the feasibility of agricultural usage of the NCV Properties.

32.    Today, agriculture is no longer an economically viable use of the NCV Properties. The current tenant leased the properties primarily to operate a seasonal pumpkin patch featuring non-agricultural entertainment facilities like hay rides, train rides, a corn maze, and even launching pumpkins from giant cannons. Such non-agricultural seasonal uses are not permitted in the City's agricultural zoning district.

8

The City's Plans for Development in North Coyote Valley

33.     After the City adopted its first General Plan in 1961 and designated the NCV Properties for "Light Industrial" use, the City experienced rapid urbanization in the 60's and 70's.  It was one of fastest growing cities in the country during the 1960s, and its population doubled between 1960 and 1975.  Economic pressure increased for development of North Coyote Valley, and industrial development commenced in North Coyote Valley, as planned.

34.     In the early 1970s, the City approved the development of the IBM Silicon Valley Laboratory at 555 Bailey Avenue in North Coyote Valley.  The IBM Silicon Valley Lab is a 600,000-square foot research and development facility which was constructed on 271 acres, with 909 acres of adjacent hilly terrain dedicated to open space.  Its location is shown on Exhibit A.

35.     By the mid-1970's the City was concerned about its ability to manage its rapid continued urban expansion, especially in outlying areas.  In 1976, the City adopted a new General Plan titled *General Plan '75* (GP 1975), which established an Urban Services Area Boundary within which urban development was to be focused during the time horizon of GP 1975, until 1990.  GP 1975 concentrated development in the City's core rather than in outlying areas, and paused development of North Coyote Valley by designating it as Agricultural.  However, the City recognized the hardship this would cause landowners in North Coyote Valley, and adopted a policy in GP 1975 to support meaningful legislation to establish a countywide funding source to purchase development rights and land for agricultural preservation.  The City further recognized in GP 1975 that a specific program of actions would be required to implement agriculture as a viable land use in Coyote Valley, including legislation to establish financing tools to acquire development rights.

36.     The City failed to accomplish the foregoing actions that it had outlined in GP 1975, and the market pressures for further urbanization of North Coyote Valley continued to grow.  Landowners in North Coyote Valley submitted applications to

9

redesignate their properties to Campus/Industrial.  The City responded by creating an

Economic Development Task Force in 1982, which recommended expanding the Urban

Service Area and amending GP 1975 to allow Campus/Industrial development in North

Coyote Valley.  The City Council accepted the Task Force's recommendations and

amended GP 1975 to allow such development in 1983.

37.    Also in 1982, the City commenced a comprehensive three-year planning

effort to guide development in North Coyote Valley.  This effort culminated in the

adoption of Resolution 58353 on May 28, 1985, wherein the City Council resolved that

"the City wishes to encourage the highest quality of development in North Coyote

Valley."  The City adopted the Development Plan for North Coyote Valley to state

"clearly and publicly the City of San Jose's goals for the development of North Coyote

Valley."  Santa Teresa Boulevard was depicted as the major north/south roadway

through the development area, and Bailey Avenue was depicted as the major east/west

roadway.  The NCV Properties, at the southwest quadrant of the intersection of Santa

Teresa and Bailey, were therefore in the heart of the area designated for development.

38.    The City's adoption of the Development Plan for North Coyote Valley

served to reinforce the Owners' reasonable beliefs that the City would allow

development of the NCV Properties, and the Owners continued to invest in the

properties based on those expectations and beliefs.

39.    In 1984, the City adopted a new General Plan, titled *Horizon 2000 General

Plan* ("GP 2000").  The NCV Properties continued to be designated for industrial

development under the Campus/Industrial land use designation in GP 2000.

40.    Ten years later, the City adopted its next General Plan in 1994, titled *San

Jose 2020 General Plan* ("GP 2020").  GP 2020 maintained the Campus Industrial land use

designation for the NCV Properties, again providing for development of the properties.

GP 2020 established the Urban Growth Boundary to demarcate where urban

development was to occur, and placed the NCV Properties *inside* that boundary, further

indicating the City's commitment to allowing the NCV Properties to be developed.  GP

10

1   2020 expected 50,000 jobs to ultimately be created in North Coyote Valley.

2

3   Developments, Approvals, and Infrastructure Investments in North Coyote Valley

4          41.    In the years since the IBM Silicon Valley Lab was approved and

5   constructed on Bailey Avenue in the 1970s, various other developments in North Coyote

6   Valley have been approved.  Some have been constructed while others, due to

7   downturns in the real estate cycles, have not been.

8          42.    The Gavilan Joint Community College District acquired 55 acres at 560

9   Bailey Avenue in North Coyote Valley (across the street from the IBM Silicon Valley

10  Lab), and planned a long-term project to construct a community college serving up to

11  10,000 students.  Pursuant to Phase I of the project, facilities have been constructed on 15

12  acres of the site, utilized primarily by the South Bay Regional Public Safety Training

13  Consortium.  The Consortium provides certified training in various areas including law

14  enforcement, fire services, and emergency medical services.

15         43.    Coyote Storage is a commercial storage site for vehicles such as motor

16  homes, recreational vehicles, and trailers.  It was developed on a 15-acre site at 611

17  Blanchard Road in North Coyote Valley.

18         44.    Metcalf Energy Center is a natural gas-fired power plant owned by

19  Calpine Corporation that was constructed on Blanchard Road in North Coyote Valley.

20  A nominal 600-megawatt combined-cycle plant, it commenced operation in 2005 and can

21  provide power for 600,000 homes.

22         45.    To serve anticipated development in North Coyote Valley, AT&T

23  constructed a switching facility on Bailey Avenue west of the NCV Properties.

24         46.    Witnessing the construction of these projects in North Coyote Valley

25  further supported the reasonableness of the beliefs of the Owners of the NCV Properties

26  that their properties too could be developed at the time they deemed most appropriate.

27  Those reasonable beliefs were also supported by the City's approval of other projects in

28  North Coyote Valley over the years.

47.     For example, in 1985 the City approved two campus industrial projects on Bailey Avenue, including one on the Sobrato property, 233 acres located immediately across Santa Teresa Boulevard from the NCV Properties.  In 2000, the City approved development of a project known as the Coyote Valley Research Park, on 688 acres including land immediately across Bailey Avenue from the NCV Properties

48.     To help finance public improvements, the City also formed Community Facilities Districts ("CFDs") to facilitate development in North Coyote Valley.  CFD 5A and CFD 5B were formed by the City in 2001 to finance the construction of a flood control detention facility, a fire station, and landscape and other maintenance.  The NCV Properties were included in CFD 5A and CFD 5B and were to be assessed taxes to finance such facilities upon the issuance of building permits.  The City also formed CFD 9 in 2002 to finance extensive improvements to Bailey Avenue, including construction of a bridge over Monterey Road and a freeway interchange with Highway 101.  The City advanced over $5 million to contribute to the cost of these facilities.

49.     Altogether, an estimated $116 million was spent on infrastructure improvements in North Coyote Valley since the 1980s to facilitate the development of industrial uses there.  These significant infrastructure investments further supported the Owners' reasonable beliefs that they could develop the NCV Properties with industrial uses at the time they deemed most appropriate.

By Adopting GP 2040, the City Continued to Allow Industrial Development in North Coyote Valley, and Developers Pursued Such Projects There

50.     In 2007, the City commenced a lengthy process to prepare its next (and current) General Plan.  A 37-member Task Force was appointed, which held 51 public meetings leading to drafting of the General Plan, and 5,000 public comments were received as part of the process.  The City adopted its current General Plan, entitled *Envision San Jose 2040* ("GP 2040"), on November 1, 2011, following four years of outreach and extensive public participation.

51.    The City's adoption of GP 2040 in 2011 once again reinforced and strengthened the City's longtime public commitment to allowing industrial development of the NCV Properties.  The NCV Properties were designated "Industrial Park" in GP 2040, which allows a wide variety of industrial uses.  North Coyote Valley was designated as an Employment Lands Growth Area, and one of the City's "Major Strategies" set forth in GP 2040 (considered "fundamental to achievement of the City's vision") was to preserve such Employment Lands.  The City also set forth numerous goals and policies in GP 2040 designed to protect industrial land uses on properties designated for such uses, like the NCV Properties.  For example, the City's Industrial Lands Goal LU-6 directed the City to "Preserve and protect industrial uses to sustain and develop the city's economy and fiscal sustainability."  As another example, the City's Fiscal Sustainability Goal FS-4 called for the City to "[m]aintain, enhance, and develop" its Employment Lands as part of its strategy for fiscal sustainability.  North Coyote Valley, included the NCV Properties, was seen as one of the primary economic engines that would provide net revenue to the City's general fund (unlike residential development, which demanded more services and were a net drain on general fund resources).  The development of North Coyote Valley was also recognized as providing diverse jobs to residents who did not have a four-year college degrees.

52.    The Owners' many decades of continued investment in the NCV Properties was based on their reasonable beliefs that the NCV Properties could be developed for industrial uses, and was supported *inter alia* by numerous City general plans that provided for such development, by the City's approval of numerous development projects, and by the expenditure of millions of dollars in infrastructure to facilitate further development in North Coyote Valley.  Such development does not proceed in linear fashion but typically in fits and starts dependent on economic cycles and market demand exerting development pressures on land that is slated for development, like the NCV Properties and North Coyote Valley.

53.    The economic pressure for development in North Coyote Valley in

accordance with GP 2040 continued to grow after the City's adoption of GP 2040 in 2011. Beginning in about 2016, the City learned of interest by several experienced developers that proposed to purchase land in North Coyote Valley for development of large warehouse/distribution centers. For example, Ellis Partners was interested in assembling the NCV Properties with other land for development of an industrial distribution warehouse or fulfillment center. Ellis Partners met with City representatives including the City's Supervising Planner regarding the project. While Ellis Partners was unable to assemble the properties and ceased pursuit of its project, its proposal did show the City that there was growing and immediate interest in industrial development in North Coyote Valley, as permitted by GP 2040.

54.    Also in 2016, another experienced developer, Pannatoni Development Company, proposed to develop a warehouse/distribution project on 29.9 acres located on Blanchard Road in North Coyote Valley, across the street from the Coyote RV Center. The City prepared a Notice of Preparation of Draft Environmental Impact Report for the Pannatoni warehouse/distribution center project in October 2016.

55.    Although the City's General Plan had allowed for industrial development in North Coyote Valley for many decades, various public and private open space interests like Peninsula Open Space Trust ("POST") and Santa Clara Valley Open Space Authority ("OSA") opposed such development in North Coyote Valley. As development in North Coyote Valley appeared to be more imminent, these interests lobbied the City to preserve North Coyote Valley and abandon the longtime plan to allow industrial development there. To prevent the proposed industrial development by Pannatoni from proceeding, POST purchased the 29.9-acre property from Pannatoni in June 2017 for $5,860,000. POST called the property "Fisher Flats," and described its acquisition as a "small step" towards creating a pathway for wildlife movement across Coyote Valley. The property is shown on Exhibit A attached, labelled "POST." At the same time, OSA declared its shared vision with POST "to protect and restore essential areas within Coyote Valley" rather than permitting the type of development authorized by GP 2040

1    from going forward.

2         56.    Because the City's General Plan continued to designate the NCV Properties

3    for Industrial Park use, and due to continued market pressures for industrial uses and a

4    shortage of available parcels in the City to meet the demand, developers continued to

5    pursue purchase of the NCV Properties for such use.  In August 2018, the owners of the

6    NCV Properties entered into Purchase and Sale Agreements with another experienced

7    developer, Scannell Properties, which intended to develop the properties with an

8    industrial use.  Scannell Properties was unable to complete its due diligence for the

9    purchase of the NCV Properties within the agreed time, as extended.  Scannell

10   Properties therefore terminated its purchase contract for the NCV Properties in

11   December 2018, although at the same time it expressed continued interest in acquiring

12   the NCV Properties and extending its due diligence period further.

13

14   The City Voters Adopt Measure T in 2018

15        57.    In 2018, the City Council began to consider submitting a general obligation

16   bond to the voters due to a backlog of deferred maintenance of over $1 billion on various

17   City public infrastructure.  At the same time, the City faced increased lobbying efforts

18   from open space interests to partner with them to preserve Coyote Valley.  On August

19   10, 2018, the City Council approved the submission of Measure T to the voters at the

20   November 6, 2018 general election, a $650 million general obligation bond entitled "The

21   Disaster Preparedness, Public Safety, and Infrastructure Bond Measure."

22        58.    Although the focus of Measure T was on upgrading 911 communications,

23   fixing potholes, and building or repairing fire stations, bridges and other physical

24   infrastructure, the City also saw the infrastructure bond as an opportunity to raise

25   money to acquire properties in North Coyote Valley in partnership with POST and OSA.

26   One of the categories of proposed Projects in the text of Measure T was $50 million for

27   "Preventing flooding and water quality contamination, including the acquisition of open

28   space in Coyote Valley for these purposes."  On September 11, 2018, the City Council

15

decided that, if Measure T were to pass, it would first hold a study session on Coyote Valley before expending any bond funds on environmental protection projects there.

59.     Although the text of Measure T included language about acquisition of land in Coyote Valley, the language of the ballot measure actually submitted to the voters did not mention Coyote Valley; nor did the ballot arguments in favor of and opposed to Measure T mention Coyote Valley.  The voters approved Measure T on November 6, 2018.

60.     Following passage of Measure T, the City held a study session on January 22, 2019 to provide information and surface issues for consideration of using Measure T funds for purchase of lands in Coyote Valley.  The differences in land use designations and allowable uses in North Coyote Valley as opposed to Mid-Coyote Valley and South Coyote Valley were presented, as was the history of planning in Coyote Valley.  The City Council received presentations from representatives of open space organizations, including POST and OSA, urging that a shared conservation vision be pursued for all of Coyote Valley.  The City Council was told that its $50 million of Measure T funds could be leveraged to provide at least $130 million to purchase and preserve land in Coyote Valley.  The City was well aware that its General Plan allowed for industrial development only in North Coyote Valley (not Mid-Coyote Valley or South Coyote Valley), and that there was growing interest from developers pursuing such projects in North Coyote Valley.  Therefore, the use of Measure T funds for land acquisition would be focused on North Coyote Valley, where development was permitted and where development pressures were most imminent.

The City Joins With POST and OSA to Purchase Industrial Land For $96 Million in North Coyote Valley To Preserve It, In Lieu of Condemning the Land

61.     Shortly after the January 2019 study session, the City—along with POST and OSA—began to pursue the purchase of land for preservation in North Coyote Valley that was designated for Industrial Park use in the City's General Plan.  In

16

partnership with POST and OSA, the City negotiated the purchase of 937 acres of land in North Coyote Valley as a "natural urban preserve."  Although all of the land acquired was designated as Industrial Park in GP 2040, the City nevertheless identified Coyote Valley as "a priority for conservation."

62.     On November 6, 2019, the City approved a series of complex transactions to acquire the 937 acres in North Coyote Valley for preservation, for a total of approximately $96 million.  The properties involved were owned primarily by entities of the Brandenburg and Sobrato families.  The location of the properties is shown on the map attached as **Exhibit D**, presented by the City, with the location of the NCV Properties added for context.

63.     The primary terms of the transaction were:

a.     The Brandenburg property, containing a total of 572 acres, would be acquired for $37,500,000.  The City would contribute $32,400,000 of Measure T bond funds toward the purchase of the Brandenburg property, with the remaining portion of the purchase price to be funded by POST.  The Brandenburg property was located both east (323 acres) and west (249 acres) of Santa Teresa Boulevard.  The City would convey all 249 acres of the Brandenburg property west of Santa Teresa Boulevard plus 27 acres of the Brandenburg property east of Santa Teresa to POST, and the City would retain the remaining 296 acres of the Brandenburg property east of Santa Teresa (shown in blue and labelled "Brandenburg East" on Exhibit D).  The City would then grant to OSA a conservation easement over the Brandenburg East land.

b.     The Sobrato property, containing a total of 335 acres, would be acquired for $37,500,000.  The Sobrato property was located east of Santa Teresa Boulevard, both north (100 acres) and south (235 acres) of Bailey Avenue.  The City would purchase the Sobrato North property for $21,500,000 in funds provided by POST, and the City would then convey the Sobrato North property to POST.  POST would purchase the Sobrato South property for $16,000,000.

c.     The City would purchase the Fisher Flats property, containing 29.9

17

acres, from POST for $5,860,000, and the City's conservation easement granted to OSA would include the Fisher Flats property. The City's purchase of the Fisher Flats property reimbursed POST for its June 2017 purchase of Fisher Flats from Pannatoni in order to prevent Pannatoni's industrial warehouse project from moving forward. Thus, it was ultimately the City that prevented the Pannatoni development, by reimbursing POST for its prior purchase of Fisher Flats.

        d.     POST would use its best efforts to acquire the Weyhe East property (containing 16.1 acres) for $2.4 million, pursuant to an option on the property held by, and acquired from, Brandenburg. POST would convey the Weyhe East property to the City upon the City's request, and the Weyhe East property would also be included in the City's grant of the conservation easement to OSA.

        e.     The City would pay $7,600,000 to redeem outstanding bonds issued for Community Facilities District No. 9. OSA would pay the City $5,000,000 for the City's $5,500,000 advance for construction of the Bailey Avenue road improvements and the City would waive the balance of the City's advance. The City would dissolve Community Facilities Districts 5A and 9.

        f.     The City would assume the existing agricultural lease on the Brandenburg property.

        64.     The City's purchase of the Brandenburg and Sobrato North properties was in lieu of using its power of eminent domain to acquire the properties. As to both purchases, the City stated:

> "The real property which Owner is selling to the City will be used for a public purpose. Had Owner not been able to reach an agreement with the City, staff would have recommended that the City adopt a resolution of necessity for the acquisition of this real property by condemnation. Please note that should Owner fail to finalize the sale of the above-referenced real property to the City, the staff shall recommend the adoption of a resolution of necessity for the acquisition of this real property by condemnation."

Thus, the City acknowledged that the continued agricultural use of the Brandenburg property pursuant to the lease that the City was assuming was for a public purpose, and that the City would have used its power of eminent domain to acquire the properties for preservation had the owners not agreed to sell their properties to the City.  The City's purchases were for a public purpose, and in lieu of condemnation.

The Foster, Benson, and Lester Families Agree to Sell the NCV Properties to CHI For $44 Million

65.    Developer interest in the NCV Properties continued even after the acquisition of the Brandenburg and Sobrato properties by the City, POST, and OSA. Market demand for industrial warehouse uses remained strong, the available inventory of land was reduced substantially due to acquisition of the Brandenburg and Sobrato Properties, while the NCV Properties continued to be designated for Industrial Park uses in the City's GP 2040.

66.    On January 29, 2020, the owners of the NCV Properties entered into Purchase and Sale Agreements with CHI-Acquisitions CA, L.P. ("CHI") pursuant to which CHI agreed to purchase the NCV Properties for approximately $44.1 million. Escrow was opened for the sale.  CHI intended to develop industrial warehouse buildings on the NCV Properties, as allowed by the City's General Plan.

67.    CHI conducted due diligence on the NCV Properties and extended the Purchase and Sale Agreements to facilitate its pursuit of the development project.  It submitted a Preliminary Review Request to the City along with a preliminary site plan and photographs for a focused review by City planning staff.  CHI located an end user for its proposed industrial warehouse project on the NCV Properties.

68.    The City, however, had other ideas.  Having "preserved" the Brandenburg and Sobrato properties in partnership with POST and OSA by acquiring them for $96 million in lieu of condemnation, the City embarked on a plan to likewise "preserve" the NCV Properties.  Because the City had exhausted its allotted Measure T funds on the

Brandenburg/Sobrato acquisition in lieu of condemnation, it had no bond money left to likewise purchase the NCV Properties in order to preserve them.  The City therefore resorted to using its regulatory power to accomplish its desired preservation of the NCV Properties.

The City Amends GP 2040 And Changes the Land Use Designation of the NCV Properties From Industrial Park to Agriculture

69.     The City commenced its Four-Year Review of GP 2040 in 2019.  The City's procedure was to convene a Citizen's Task Force to make recommendations regarding the General Plan to the Planning Commission, which would consider those recommendations and make its own recommendations to the City Council.  The City appointed the members of the Task Force and set the scope of its work.  The Task Force had 40 members, but none of them were property owners in Coyote Valley.  The scope of the Task Force's work, as set by the City Council, included discussion on the long-term future of North Coyote Valley and the Mid-Coyote Urban Reserve.

70.     As directed, the Task Force met on October 29, 2020 to discuss the long-term future of Coyote Valley.  Planning staff proposed a "new vision" for Coyote Valley: that it be "preserved as a resource for the community."  Following the purchase for preservation of the Brandenburg and Sobrato properties in 2019, and accounting for the fact that a portion of North Coyote Valley was already developed (for example, the IBM Research Facility and the Gavilan College), planning staff recognized that there were only 314 acres of "Remaining Developable Parcels" in North Coyote Valley.  The "Remaining Developable Parcels" identified by the City are shown on **Exhibit E**, which was presented to the Task Force, with the location of the NCV Properties added.  The NCV Properties constituted more than 40% of the only "Remaining Developable Parcels" in North Coyote Valley, as identified by the City.

71.     The NCV Properties are unique even among the "Remaining Developable Parcels" identified by the City in North Coyote Valley.  The properties west of Santa

Teresa Boulevard are either in the 100-year flood plain of Fisher Creek (requiring expensive flood control facilities before they could be developed) or in hilly terrain. Together, the NCV Properties are not within any mapped flood plain, are flat, and are easily accessible from Bailey Avenue and its nearby interchange with Highway 101.

72.    To advance its new vision to preserve Coyote Valley, City staff recommended that the land use designation of the NCV Properties be changed from Industrial Park to Agriculture.  Among the reasons stated by City staff for this recommendation was that development in North Coyote Valley could impact the City's decision to spend $46.3 of Measure T funds toward acquisition of the Brandenburg and Sobrato properties for preservation, with POST and OSA, a year earlier.  Thus, having spent money to buy other North Coyote Valley property for preservation, the City was using its own purchase as a justification to preserve the NCV Properties without purchasing them.

73.    The Task Force voted to accept staff's recommendation that Coyote Valley "should be preserved as a resource for the community," including changing the land use designation of the NCV Properties from Industrial Park to Agriculture.

74.    The Task Force's recommendations were presented by staff to the City's Planning Commission on October 27, 2021.  Staff recommended that the Task Force's recommendations (which had been proposed by staff) be approved by the Planning Commission.  The Planning Commission held a public hearing on the proposed amendments to GP 2040 but voted to **deny** staff's recommendations.  Several Planning Commissioners remarked that the action was unfair to property owners in North Coyote Valley because the City had purchased the Brandenburg and Sobrato properties, but it was not offering to purchase the Remaining Developable Parcels, including the NCV Properties.  Several Planning Commissioners also remarked that it was unfair to the Owners to re-designate the NCV Properties to Agriculture but not adequately compensate them for the reduction in the value of their land caused by the re-designation.

75.     Notwithstanding the Planning Commission's October 27, 2021 vote to deny staff's recommended amendments to GP 2040, staff continued to recommend that the same amendments to GP 2040 be adopted by the City Council.  The City Council set the matter for a public hearing on November 16, 2021.

76.     Before the Planning Commission's October 27, 2021 public hearing, the Owners of the NCV Properties obtained a September 2021 expert report titled "The Economic Viability and Financial Feasibility of the Continued Agricultural Use of the North Coyote Valley Properties in the City of San Jose" by Dr. Daniel A. Sumner, Distinguished Professor of Agricultural and Resource Economics at the University of California, Davis.  The Sumner Report concluded that agriculture was not an economically viable use of the NCV Properties.  The Sumner Report was provided to members of the Planning Commission and to members of the City Council (as well as to City staff) on September 14, 2021, before their respective meetings.  On October 20, 2021 (before the City Council meeting), during a call with one of the owners of the NCV Properties and her counsel, Mayor Liccardo stated that he did not need a report to know that agricultural use of the NCV Properties was not economically viable.

77.     The City Council held its public hearing on November 16, 2021 to consider staff's recommendations regarding Coyote Valley.  Before the meeting commenced, the land use designation of the NCV Properties in GP 2040 was Industrial Park, and the zoning designation of the NCV Properties was R-1-1 single family residential.  However, the zoning designation of the NCV Properties pre-dated the adoption of SB 1333, which required that the zoning designation of properties in charter cities be consistent with the properties' land use designation in the charter city's General Plan.  Because the residential zoning of the NCV Properties was inconsistent with the Industrial Park land use designation of the NCV Properties in GP 2040, the land use designation took precedence, and the NCV Properties were required to be rezoned to IP-Industrial Park by a conforming rezone to make the zoning consistent with the land use designation.

78.     The theme of the November 16, 2021 City Council meeting was to

"*preserve*" Coyote Valley through regulatory action.  Councilmembers repeatedly

referred to "the *preservation* of Coyote Valley."  Councilmember comments included:

"We as a city move forward with the spirit of *preservation*;" "Today I vote to *preserve* the

Coyote Valley;" "We *preserve* the land for future generations;" "There is a lot that Coyote

Valley has to offer and that we can *preserve* there;" and "It's really important to figure out

how to best *preserve* the area for future generations to continue to enjoy it."

79.    At the conclusion of the November 16, 2021 public hearing, the City

Council adopted, *inter alia,*  the following measures:

a.    Resolution 80301, changing the land use designation of the NCV

Properties in GP 2040 from Industrial Park to Agriculture.  This land use designation

change took effect on December 31, 2021 as provided in Resolution 80301.  Resolution

80301 also established the Coyote Valley Agricultural Overlay, which required

minimum lot sizes of 40 acres for parcels within the overlay, including the NCV

Properties.

b.    Ordinance 30688, changing the zoning of the NCV Properties from

R-1-1 Single Family Residence to Agriculture.  Ordinance 30688 was given its final

reading and passage by the City Council on November 30, 2021, and became effective on

December 31, 2021.

80.    The City-initiated change to the land use designation of the NCV

Properties from Industrial Park to Agriculture (and the associated conforming zoning

change) established, to a reasonable degree of certainty, the permissible uses of the NCV

Properties.  Plaintiffs, as the Owners of the NCV Properties, did not seek or support the

City-initiated change to the land use designation of their properties in GP 2040.  Quite to

the contrary, Plaintiffs actively opposed the City-initiated change to the land use

designation of their properties in GP 2040, before the City's Task Force, before the City's

Planning Commission, and before the City Council.  The change to the land use

designation of the NCV Properties was entirely initiated by and imposed by the City,

over the objection of Plaintiffs.

81.     The City-initiated change to the land use designation of the NCV Properties had an immediate impact on the NCV Properties because the General Plan land use designation is at the top of the hierarchy of local government law regulating land use.  Before the City's adoption of Resolution 80301, the NCV Properties were allowed to be used for Industrial Park use.  But after the adoption of Resolution 80301, the NCV Properties are required to be used for Agricultural use—despite the fact that Dr. Sumner's Report had concluded that agriculture is not an economically viable use and Mayor Liccardo had stated that he did not even have to read that report to know that agricultural use of the NCV Properties is not economically viable.  There is no ability or opportunity to obtain a variance from the provisions of the General Plan.

CHI Terminates Its Contracts to Purchase the NCV Properties in Light of the City's Regulatory Action

82.     When CHI entered into the agreements to purchase the NCV Properties for $44.1 million, it intended to develop industrial warehouse buildings on the NCV Properties.  After the City-initiated change to the land use designation of the NCV Properties to Agriculture was adopted, CHI was precluded from developing industrial warehouse buildings on the NCV Properties.  Within days of the effective date of Resolution 80301 and Ordinance 30688, CHI terminated the contracts to purchase the NCV Properties.

83.     Not only did the City's action cause a termination of the CHI contracts, it also precluded further use of the NCV Properties for seasonal pumpkin patch uses, because such seasonal uses are not permitted by the City in the Agriculture zone.

## FIRST CLAIM FOR RELIEF

### Taking Under the Fifth Amendment – 42 U.S.C. §1983

84.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 83 above.

24

85.    The Fifth Amendment to the Constitution of the United States includes the takings clause:  "Nor shall private property be taken for public use, without just compensation."

86.    By requiring "Agriculture" use of the NCV Properties through its actions described above, the City has refused to allow any economically productive or beneficial use of the NCV Properties.  Agriculture is not an economically viable use of the NCV Properties.  The City has thereby effected a *per se* taking of the NCV Properties without just compensation.  This violates the takings clause of the Fifth Amendment.

87.    In the alternative, the City has effected a taking of the NCV Properties, in violation of the Fifth Amendment, under the principles established in *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104 (1978).  The economic impact of the City's actions on the value of the NCV Properties is severe.  The City has interfered with Plaintiffs' reasonable investment-backed expectations as they relate to development of the NCV Properties.  Plaintiffs have watched as the City has allowed development of certain properties in North Coyote Valley; has expended millions of dollars in infrastructure improvements to support development within North Coyote Valley; has adopted a series of General Plans that allowed industrial uses to be developed in North Coyote Valley, including GP 2040, the City's current General Plan, adopted in 2011 following massive public input and debate; has long included the NCV Properties inside the City's Urban Growth Boundary and Urban Services Area; and most recently has joined with POST and OSA to use its power of eminent domain to purchase – in lieu of condemnation – the majority of land in North Coyote Valley that had been designated for industrial park uses, while refusing to purchase the NCV Properties.  The character of the City's action in re-designating the NCV Properties as Agriculture and rezoning the NCV Properties to be consistent with the new land use designation in order to "preserve" them "as a resource for the community," as more fully described above, likewise militates in favor of finding a taking.

88.    The regulatory acts of the City regarding the NCV Properties have gone

25

too far.  The City's actions have forced Plaintiffs to bear public burdens which, in all

fairness and justice, should be borne by the public as a whole.

89.     The permissible uses of the NCV Properties are known to a reasonable

degree of certainty.  By amending the land use designation of the NCV Properties in GP

2040, the City has altered its "constitution" of land use planning, requiring all other

regulations and actions to be consistent with, and controlled by, the Agriculture land use

designation of the NCV Properties.  The City, by its actions, has made clear that only

agricultural uses of the NCV Properties are permissible.

90.     There is no procedure to process a variance or excuse from the edict of the

Agriculture land use designation of the NCV Properties in GP 2040.  It would be futile

for Plaintiffs to seek another general plan amendment, as the City's actions in proposing,

adopting, and imposing the new Agriculture land use designation on the NCV

Properties have made it clear that the City intends to allow only agricultural use of the

land.

91.     The City's actions have deprived Plaintiffs of their constitutional rights

under the Fifth Amendment's takings clause, in violation of 42 U.S.C. §1983.

92.     Plaintiffs are accordingly entitled to recover just compensation for the

taking of the NCV Properties.  Plaintiffs are also entitled to recover their attorneys' fees

and additional expenses normally charged to fee-paying clients, under 42 U.S.C. §1988.


**SECOND CLAIM FOR RELIEF**

**For Violation of Equal Protection Under the Fourteenth Amendment – 42 U.S.C. §1983**

93.     Plaintiffs incorporate by reference the allegations contained in paragraphs

1 through 83 above.

94.     The Fourteenth Amendment to the Constitution of the United States

provides that no State shall "deny to any person within its jurisdiction the equal

protection of the laws."  The equal protection clause secures every person against

intentional and arbitrary discrimination, whether occasioned by the express terms of a

1    statute or regulation or by the improper execution of the law.

2         95.    While the City's adoption of Resolution 80301 changed the land use

3    designation of numerous properties, the other properties were situated substantially

4    differently from the NCV Properties.  The vast majority of the properties re-designated

5    by Resolution 80301 were located in Mid-Coyote Valley, not North Coyote Valley.  The

6    Mid-Coyote Valley properties were not allowed to develop even before the City adopted

7    Resolution 80301; they were designated as Urban Reserve in GP 2040, a land use

8    designation that provided that "no urban or suburban development will occur there

9    through the year 2040."  Also, the Mid-Coyote Valley properties were not located within

10   the City's jurisdictional limits, and were not located within the Urban Service Area,

11   where urban development was to occur.

12        96.    As the City recognized, only ten parcels comprised the "Remaining

13   Developable Parcels" in North Coyote Valley before the adoption of Resolution 80301.

14   They are depicted on the City-prepared exhibit attached as Exhibit E.  The parcels

15   located on Bailey Avenue west of Santa Teresa were not similarly situated to the NCV

16   Properties.  They were either located within the floodplain of Fisher Creek or in the

17   foothills of the Santa Cruz Mountains.

18        97.    There were properties in North Coyote Valley that were similarly situated

19   to—indeed, almost identical in all material respects to—the NCV Properties:  the

20   Brandenburg East properties, depicted on Exhibit D.  The Brandenburg East properties

21   were immediately adjacent to the NCV Properties, located directly across Bailey

22   Avenue.  The Brandenburg East properties were designated for Industrial Park use in

23   GP 2040, like the NCV Properties.  The Brandenburg East properties were being leased

24   to tenants for interim agriculture uses, like the NCV Properties.  The Brandenburg East

25   properties were flat and easily accessible by public improvements that had been

26   constructed, including a bridge over Monterey Road and a freeway interchange with

27   Highway 101, like the NCV Properties.  The Brandenburg East properties are underlain

28   by the Santa Clara Subbasin and are served by San Jose Municipal Water, like the NCV

27

1    Properties.  The Brandenburg East properties were experiencing economic pressures for

2    industrial development consistent with their land use designation (as shown by the

3    Pannatoni warehouse project, which was halted by POST's purchase of the land), like the

4    NCV Properties.

5        98.    As alleged above, the City used its eminent domain power to purchase the

6    Brandenburg East properties in lieu of condemnation in November 2019 for

7    preservation.  The City acknowledged that its purchase of the Brandenburg East

8    properties was for a public purpose—to preserve the properties from urban

9    development.

10       99.    The same public purpose of preservation that was cited by the City to

11   support its acquisition of the Brandenburg East properties also supported the City's

12   actions in changing the land use designation of the NCV Properties from Industrial Park

13   to Agriculture.  The acquisition of the Brandenburg East properties created a "natural

14   urban preserve" in North Coyote Valley according to the City; and the re-designation of

15   the NCV Properties allowed them to be "preserved as a resource for the community,"

16   according to the City.  Both the City's purchase of the Brandenburg East properties and

17   the City's redesignation of the NCV Properties accomplished the same objective of

18   preservation and prevention of urban development of the properties.  The City has

19   unfairly discriminated against Plaintiffs by using its power of eminent domain to

20   acquire the Brandenburg East properties in lieu of condemnation while refusing to use

21   the same power to purchase the NCV Properties.  The City's actions have been plainly

22   arbitrary because it recognized its obligation to purchase the Brandenburg East

23   properties in order to preserve them but has attempted to use its regulatory power to

24   preserve the similarly situated NCV Properties.

25       100.    The City's actions have deprived Plaintiffs of their constitutional rights

26   under the Fourteenth Amendment's equal protections clause, in violation of 42 U.S.C.

27   §1983.

28       101.    Plaintiffs have suffered damages due to the City's violation of their right to

equal protection.  Plaintiffs are entitled to recover their damages as well as their attorneys' fees and additional expenses normally charged to fee-paying clients, under 42 U.S.C. §1988.

## THIRD CLAIM FOR RELIEF

**For Violation of Due Process Under the Fourteenth Amendment – 42 U.S.C. §1983**

102.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 83 and 95 through 99 above.

103.    The Fourteenth Amendment to the Constitution of the United States guarantees that no State shall "deprive any person of life, liberty, or property, without due process of law."  The due process clause includes a substantive component that guards against arbitrary, capricious, malicious, abusive, or irrational government action.

104.    Plaintiffs have a constitutionally protected property interest in the right to devote the NCV Properties to any legitimate use.  The City violated Plaintiffs' right to substantive due process by arbitrarily using its power of eminent domain to purchase certain properties in lieu of condemnation in order to preserve them, while seeking to preserve the NCV Properties without purchasing them but rather changing their land use designation from Industrial Park to Agriculture.

105.    The City's actions have deprived Plaintiffs of their constitutional rights under the Fourteenth Amendment's due process clause, in violation of 42 U.S.C. §1983.

106.    Plaintiffs have suffered damages due to the City's violation of their right to substantive due process.  Plaintiffs are entitled to recover their damages as well as their attorneys' fees and additional expenses normally charged to fee-paying clients, under 42 U.S.C. §1988.

## PRAYER FOR RELIEF

Plaintiffs respectfully pray for relief as follows:

29

**On the First Claim for Relief:**

For just compensation under the Fifth Amendment to the United States Constitution, pursuant to 42 U.S.C. §1983.

**On the Second Claim for Relief:**

For damages under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. §1983.

**On the Third Claim for Relief:**

For damages under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. §1983.

**On All Claims for Relief:**

For attorneys' fees and additional expenses normally charged to fee-paying clients, pursuant to 42 U.S.C. §1988;

For costs of suit; and

For all such other and further relief as the Court deems just and proper.

Dated:   February 9, 2022         MANATT, PHELPS & PHILLIPS, LLP

By: _____
         Edward G. Burg
         *Attorneys for Plaintiffs*

1

**DEMAND FOR JURY TRIAL**

2
        Plaintiffs hereby demand trial by jury.

3

4   Dated:   February 9, 2022                MANATT, PHELPS & PHILLIPS, LLP

5

6                                       By:  _____

7                                            Edward G. Burg
                                             *Attorneys for Plaintiffs*

8

9   400940316.3

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



Brandenberg
(open space)

IBM

Sobrato
(open space)

POST

Sobrato
(open space)

Brandenberg
(City)

Fisher Creek

SANTA TERESA BLVD

Subject Property
126 Acres

BAILEY AVE

MONTEREY HWY

US
101

Residential Development

Union Pacific Rail

# EXHIBIT B



NORTH COYOTE
VALLEY PROPERTIES

Legend:
- City of San Jose Boundary
- Urban Service Area
- Urban Growth Boundary
- Sphere of Influence
- Proposed Coyote Valley Agriculture Overlay

Map Prepared by: City of San Jose Planning Division, May 2020

# EXHIBIT C

Existing
Land Use
Designations



# EXHIBIT D



North Coyote Acquisition Structure

■ POST Fee-owned, Planned Transfer to SCVOSA   ▢ North Coyote Valley
■ City of San Jose Fee-owned, SCVOSA Easement   ▢ Mid Coyote Valley
                                                 ▢ South Coyote Valley

**EXHIBIT E**



North Coyote Valley Growth Area

- Remaining Developable Parcels
- Properties Purchased by CSJ and POST/OSA
- Parcel
- Building Footprints
- Urban Service Area
- Urban Growth Boundary
- Sphere of Influence
- Water Body
- Creek
- North Coyote Valley Growth Area
- Coyote Greenbelt
- Coyote Valley Urban Reserve

Metcalf Energy Center

Coyote Storage

NORTH COYOTE VALLEY PROPERTIES

IBM Silicon Valley Lab

Gavilan College Coyote Valley Center

Map Prepared by: City of San Jose Planning Division, August 2018